El Pueblo, Demandante y Apelante, *v.* Soto, Conocido por Pantaleón, Acusado y Apelado.

Apelación procedente de la Corte de Distrito de Mayagüez en causa por asesinato en segundo grado.

No. 1182.—Resuelto en junio 26, 1918.

Nuevo Juicio—Discreción Judicial.—"La discreción judicial, más bien que la ley estricta, comunmente determina si se debe o no conceder un nuevo juicio." Y "los nuevos juicios deben concederse con mayor liberalidad en causas criminales que en las civiles, y en las criminales la mayor liberalidad en proporción a la gravedad de la pena."

Tanto el juez sentenciador como el jurado deben quedar satisfechos de que la prueba en su totalidad sea suficiente para sostener el veredicto. De otro modo "no sólo llega a ser el debido ejercicio de una discreción judicial sino su deber de conceder un nuevo juicio." Y en apelación "una orden por la que se conceda o deniegue el nuevo juicio no será alterada a menos que se haga manifiesto un abuso de discreción."

Los hechos están expresados en la opinión.

Abogado del apelante: *Sr. Salvador Mestre, Fiscal.*

Abogados del apelado: *Sres. Feliú & Alemañy.*

El Juez Asociado Sr. Hutchison, emitió la opinión del tribunal.

Después de haberse celebrado un juicio por jurado, que dió por resultado un veredicto de culpabilidad de asesinato en segundo grado, el juez de distrito, estimando que la prueba circunstancial sobre la que descansaba la acusación no era suficiente para sostener el veredicto, lo dejó sin efecto y concedió un nuevo juicio.

El Gobierno apeló de esta orden de la corte inferior.

"La discreción judicial, más bien que la ley estricta, comúnmente determina si se debe o no conceder un nuevo juicio." Y "los nuevos juicios deben concederse con mayor liberalidad en causas criminales que en las civiles, y en las criminales la mayor liberalidad en proporción a la gravedad de la pena." 2 Bishop's New Crim. Proc., pp. 1113 y 1106, secs. 1277 y 1273.

Tanto el juez sentenciador, como el jurado deben quedar satisfechos de que la prueba en su totalidad sea suficiente

para sostener el veredicto.   De otro modo "no sólo llega a ser el debido ejercicio de una discreción judicial sino su deber de conceder un nuevo juicio." *People* v. *Lum Yit,* 83 Cal., 130, y casos citados.   Véase también: 2 Bishop's New Crim. Proc., p. 1114, sec. 1278.   Y en apelación "una orden por la que se conceda o deniegue el nuevo juicio no será alterada a menos que se haga manifiesto un abuso de discreción." *People* v. *Mallicoat,* 149 Pac. 1000, y casos citados.   Véase también 2 Bishop's New Crim. Proc., p. 1098, sec. 1269; id. p. 1107, sec. 1274.

Puesto que habrá de celebrarse un nuevo juicio, preferimos no discutir la prueba.   Bastará decir que si se hace una detenida lectura de toda la prueba, nada se revela en ella que indique que se haya cometido un abuso de discreción.

Es de confirmarse la orden recurrida.

*Confirmada la orden recurrida.*

Jueces concurrentes: Sres Asociados Wolf y del Toro.

Los Jueces Sres. Presidente Hernández y Asociado Aldrey disintieron.

---

OPINIÓN DISIDENTE EMITIDA POR EL JUEZ ASOCIADO SR. ALDREY CON LA CUAL ESTÁ CONFORME EL JUEZ PRESIDENTE SR. HERNÁNDEZ.

Estamos conformes con los principios consignados en la opinión emitida en este caso por la mayoría del tribunal respecto a que los tribunales de apelaciones no revocan la concesión o negativa de un nuevo juicio hecha por un tribunal inferior a menos que hubiera cometido abuso de su discreción al concederlo.   Esta doctrina aparece confirmada en el caso que se cita de *El Pueblo* v. *Mallicoat,* 149 Pac. 1001 en el que se había negado un nuevo juicio.   En él se dice también que para que el juez conceda un nuevo juicio deberá creer que el veredicto no está sostenido por la prueba y que si subsistiera se impondría un castigo injusto.   Por esto en el caso del *Pueblo* v. *Lum Yit,* 83 Cal. 130 citado por

la mayoría hubiéramos sostenido la concesión de un nuevo juicio porque en verdad el veredicto de culpabilidad era contrario a la prueba pues no aparecía demostrada la existencia del delito. En el de *El Pueblo* v. *Baker,* 39 Cal. 687, que se cita en el caso anterior, no se exponen los hechos y se limita a decir que aunque la prueba tiene una fuerte preponderancia en favor del veredicto no puede describirse que hubo abuso de discreción. Aceptamos también que cuando la prueba no es suficiente para sostener el veredicto, y esto ocurre cuando es contrario a las pruebas tiene el juez que preside el juicio no solamente el derecho de conceder un nuevo juicio sino más bien el deber de hacerlo así.

La cuestión pues que realmente nos separa de los jueces de la mayoría en este caso es que ellos no ven por la transcripción, que hubo abuso de discreción en la concesión de un nuevo juicio a Pablo Soto Denizac y nosotros entendemos por el contrario que las pruebas demuestran que el juez en este caso abusó de la facultad que le concede el artículo 303, No. 6º. del Código de Enjuiciamiento Criminal de conceder un nuevo juicio cuando el veredicto fuere contrario a las pruebas, pues no tenía ese carácter el veredicto rendido en este caso. En este terreno las cosas y como cada caso tiene su matiz especial, examinaremos las pruebas para ver si el veredicto era o no contrario a ellas.

Pablo Soto Denizac fué acusado por el fiscal de distrito de Mayagüez de haber asesinado a Anselmo Mercado en las primeras horas de la noche del sábado 20 de mayo de 1916. El jurado que conoció del juicio lo declaró culpable de asesinato en segundo grado, pero posteriormente y a petición del abogado del acusado el juez de dicha corte le concedió un nuevo juicio y anuló el veredicto fundándose en que la prueba que se había presentado era insuficiente para sostener la declaración de culpabilidad porque siendo indiciaria y circunstancial, solamente el cuchillo que se encontró en el sitio donde Mercado fué encontrado muerto tiende a relacionar al acusado con el crimen, y que en cuanto a la prueba de otros

indicios como la conducta del acusado, contradicciones de éste, móvil del crimen, su valor es poco; que si bien el fiscal presentó prueba de que el interfecto debía estar en posesión de tres o cuatro dollars en el momento de su muerte y que el estado de sus vestidos demostraba que le fueron sustraídos, no probó que el acusado tenía conocimiento de la existencia de tal dinero en poder del muerto y que no hubo prueba de que en posesión del acusado se encontrara ni un solo centavo después de la fecha de la comisión del delito. Reconoce el juez que por la acusación se tendió a probar que el acusado al llegar a su casa cinco días después del crimen trataba de impedir el ser visto por la policía y admite el juez que este indicio tendría mucha importancia si hubiera una evidencia vigorosa que conectara al acusado con el crimen, pero que faltando ésta tiene poco valor. Añade la corte que la misma evidencia del Gobierno prueba que el acusado estuvo en la central Eureka de Mayagüez hasta las seis de la tarde del día en que se cometió el crimen, lo que hace muy difícil que pudiera estar en este lugar entre 7 y 8 de la noche, hora en que ha debido cometerse, pues el acusado no tenía dinero alguno con que alquilar un vehículo en que trasportarse de un sitio a otro y no hay prueba alguna de que se trasportara en ninguna forma. Por último agrega que el único indicio que trata de conectar al acusado con el crimen es el cuchillo encontrado al lado del interfecto la noche de su muerte; que el Gobierno presentó prueba directa del hallazgo y de haberse visto dicho cuchillo en poder del acusado durante varias veces, siendo la más reciente de éstas como siete ú ocho días antes del crimen; e indiciaria e hipotética de que con dicho cuchillo se cometió el crimen, porque el que haya estado en poder del acusado siete u ocho días antes del crimen no quiere decir que aquél sea culpable del delito porque esta circunstancia tomada aisladamente no tiene valor alguno, porque el acusado ha podido perder su cuchillo durante esos siete u ocho días, serle sustraído, etc.

Cuando el fiscal terminó su prueba en este juicio la corte

negó la moción del abogado del acusado para que ordenara al jurado que lo absolviera perentoriamente por no haber probado la acusación el crimen; después presentó la defensa algunos testigos y dictado veredicto de culpabilidad por el jurado; a instancia de la defensa del acusado concedió un nuevo juicio contra cuya resolución interpuso este recurso el fiscal de aquel distrito, que ha sido sostenido ante nosotros por el Fiscal de este Tribunal Supremo.

Aunque el abogado del acusado nos pide en su alegato contestando al del fiscal que desestimemos el recurso porque no se le notificó la transcripción de la apelación y porque el alegato del fiscal no especifica los errores que atribuye al juez inferior en su resolución apelada, no accederemos a tal petición porque no cita ni conocemos precepto alguno que en casos criminales imponga el deber de hacer tal notificación y porque no encontramos justificado el segundo fundamento, ni por tal motivo desestimaríamos este recurso, con mayor razón tratándose de un delito de asesinato. Así, pues, consideraremos el recurso.

Anselmo Mercado, el interfecto en este caso, fué encontrado muerto en el Callejón de los Perros, camino del Miradero o del Quemado, cerca del puente Yournet, próximo al sitio conocido por las Yagaretas, un sábado después de haber cobrado a eso de las cinco de la tarde su jornal de $3.79 de la hacienda "Rochelaise," adonde había ido desde su casa sin llevar consigo arma alguna. Tenía una herida en el pecho que seccionó los cartílagos del esternón con la tercera, cuarta y quinta costillas del lado izquierdo y que le atravesó el corazón produciéndole la muerte inmediatamente, herida que debió ser inferida con un instrumento cortante y punzante como el cuchillo que manchado de sangre se encontró cerca del difunto. No tenía el interfecto señales de lucha en su cuerpo ni se encontró dinero alguno en sus ropas, pero el bolsillo izquierdo del pantalón estaba salido hacia afuera, el derecho a medio salir y la faltriquera donde se acostumbra a poner el reloj estaba vacía y desgarrada.

Aunque la defensa del acusado alega que en este caso no se ha probado el *corpus delicti* porque no existe prueba fuera de duda razonable de que la muerte de Mercado fuera producida por una mano extraña a él, sin embargo opinamos que el jurado estuvo justificado en su veredicto respecto a la existencia de un crimen por cuanto junto al cadáver fué encontrado un cuchillo manchado de sangre, que no pertenecía a Mercado, con el cual pudo ser inferida la herida que le privó de la vida; por la naturaleza de la herida, tan tremenda que le seccionó los cartílagos de tres costillas y le atravesó el corazón y porque aunque no es necesario probar la existencia del móvil de un delito (*El Pueblo* v. *Rivera*, 25 D.-P. R. 812) el hecho de que no tuviera Mercado señales de lucha, que no se le encontrara el dinero que poco tiempo antes de morir había cobrado y el tener los bolsillos de su pantalón en la forma que hemos dicho, son indicios bastantes para estimar probado que una mano extraña y criminal lo mató para robarle, pues, aunque jornalero, era probable que tuviera dinero consigo porque los sábados son generalmente los días de cobro para los obreros.

No hubo prueba directa del crimen.  No la hay de ninguna clase de que el acusado y Mercado se conocieran en ninguna forma y por tanto que hubieran tenido resentimiento o agrevio de ninguna clase.  En verdad la prueba principal en este caso es la del hallazgo del cuchillo manchado de sangre junto al cadáver de Mercado, la posibilidad de que con un arma de esa clase se cometió el crimen y la prueba de la pertenencia de ella por el acusado.

Respecto al particular de la propiedad de ese cuchillo la prueba es tan abundante que no podemos creer que alguien dude de que ese cuchillo pertenecía al acusado Pablo Soto Denizac desde algunos meses antes de la muerte de Mercado y que en muchas ocasiones durante ese tiempo fué visto en su poder, la última de esas veces el 16 de mayo cuando salió de la casa de los esposos Aquino, cuatro días antes de la muerte de Mercado, y no siete o ocho como dice el juez de la

corte inferior en su opinión escrita para fundar la concesión del nuevo juicio. El cuchillo es de tal clase que el que lo fabricó lo reconoció, así como su entrega en cambio de otro al acusado; tenía señas particulares que sirvieron a los testigos para identificarlo y la esposa del acusado lo reconoció entre diez o doce que juntos con él se le presentaron. Es cierto que el fiscal ocupó durante la investigación otro cuchillo que el acusado había entregado algún tiempo antes del hecho que se persigue en esta causa a un pariente suyo y que la defensa lo presentó en el juicio como para demostrar que era el único cuchillo que había tenido el acusado, pero la prueba respecto al otro fué enteramente convincente y la creyó el jurado.

Tenemos pues un punto de partida importante en este asunto y es que el expresado cuchillo pertenecía a Pablo Soto Denizac y lo tenía en su poder cuatro días antes de la muerte de Mercado. Es cierto que, como dice el juez inferior, éste es el único indicio que trata de conectar al acusado con el crimen, pero dadas las circunstancias que ocurren en este caso creemos que es tan fuerte que unido a los otros debe producir la convicción de culpabilidad, a menos que se hubiera probado que era materialmente imposible para él haber cometido ese crimen.

Aunque es una hipótesis que el crimen se cometió con esa arma por la forma y dimensiones de la herida que tenía Mercado, la hipótesis adquiere un grado tan fuerte de posibilidad por el hecho de haber sido encontrado el cuchillo manchado de sangre junto al cadáver inmediatamente después de cometerse el crimen, ya que según el fiscal cuando el interfecto fué levantado estaba aún "completamente flexible" que podemos tener la certeza, fuera de duda razonable, de que con ese cuchillo se causó la muerte. En vista de esta conclusión y habiéndose demostrado que el acusado tenía ese cuchillo en su poder cuatro días antes de morir Mercado y habiendo declarado el acusado que tal arma nunca estuvo en su posesión, tenemos que llegar a la conclusión de que esos dos hechos

son fuertes indicios de su culpabilidad.   La negativa del acusado respecto a la posesión del cuchillo impide que probado lo contrario pueda tenerse en cuenta la posibilidad de que lo hubiera perdido o le hubiera sido sustraído.

Además de los indicios mencionados existen otros que robustecen la idea de su culpabilidad en este crimen.

El acusado dejó su casa hacia el 7 de mayo para ir en busca de trabajo; hasta el 17 de mayo en que llegó a la Central Eureka de Mayagüez estuvo por San Germán sin trabajar y sin dinero; del día 17 al sábado 20 trabajó solamente en la Central Eureka medio día y un rato de otro, por lo que le pagaron 35 centavos; no trabajó después y el día 24 regresó a la casa de su concubina; manifestó a un vecino que si pasaba la policía le avisara para esconderse porque en el camino cerca de las Yagaretas había sido asaltado por otros hombres, le habían tirado el cuchillo de un palo que le dieron y entonces él atacó con su machete, y le había dado a uno que cayó al suelo; en la declaración espontánea que prestó reconoció haber mentido cuando al principio de ella dijo que era quincallero; se demostró la falsedad de su declaración en muchos extremos pues mientras él aseguró que la máquina de la Central Eureka donde trabajaba estaba sin andar en la noche del sábado 20 al 21 y que durmió en el conducto de cañas llamado "ladrón" sin embargo se demostró que esa noche dicha máquina estaba en movimiento y que por este motivo no podía dormir persona alguna en ese sitio; no pagó los días que comió en la Eureka a pesar de que el sábado ofreció satisfacer la deuda.   Además, es bastante significativo el hecho de que cuando fué detenido al día siguiente de regresar a su casa, antes de saber la causa de su detención tratara de avisar a un cuñado suyo de la Central Eureka para que preparara sus testigos, que no podían serlo para el encuentro que luego dijo que tuvo en las Yagaretas con otros hombres ya que este hecho lo admitió, sino para esta causa.

Lo expuesto y algunos otros detalles más que no mencionaremos porque son muchos y de menor importancia ro-

bustece la idea de que fué el acusado quien cometió el crimen que se le imputa, sin que el hecho de que no probara el fiscal que el acusado tenía consigo ni un sólo centavo y que tenía conocimiento de que el interfecto llevaba dinero consigo influya en algo para debilitar los indicios que existen contra el acusado ya que éste fué detenido cinco días después del crímen y porque habiendo sido muerto Mercado un sábado por la noche podía presumir que llevaba dinero consigo por ser dicho día en el que generalmente cobran los obreros.

El único hecho que después de tales indicios podría rebatir la culpabilidad del acusado es que físicamente fuera imposible que cometiera ese crimen. Esto alega la defensa y encuentra apoyo en el juez de la corte inferior cuando manifiesta que se hacía muy difícil que el acusado pudiera estar en la Central Eureka a las seis de la tarde y de siete a ocho en el lugar del crimen.

Es cierto que un testigo declaró que vió al acusado en la Central Eureka entre cinco y media y seis de la tarde del sábado veinte de mayo pues el pito de la central acostumbra sonar a esa hora llamando a los que han de trabajar; que, según otro testigo, de la Eureka a Mayagüez se tarda a pie como dos horas y que, según otro, de Mayagüez al lugar del crimen se emplea a pie una media hora, en total dos horas y media. Pero lo que no aparece tan claro es la hora en que murió Mercado pues, mientras su padre dice que lo encontró muerto entre ocho y ocho y media de la noche, pero sin precisarla porque no tenía reloj, que entonces fué donde uno llamado Señó Ramón, con él volvió al sitio y luego se dirigió a Mayagüez a dar cuenta a las autoridades, y que el jefe de la policía dijo que lo vió en la fiscalía de Mayagüez a las ocho y media, de donde deduce el juez que la muerte debió ocurrir entre siete y ocho, por otra parte el Fiscal de Mayagüez manifestó que estaba esa noche en su casa cuando a eso de las diez se le presentó el padre de Mercado, que inmediatamente después fué al cuartel de la policía y con el jefe, otro guardia y el padre denunciante se dirigieron en coche al lugar

del suceso tardando unos veinte minutos y siendo las diez y cuarto por su reloj cuando levantaban el cadáver, hora ésta manifestada también por el jefe de la policía.

No hay pues precisión en la hora de la muerte de Mercado, que pudo ocurrir entre siete y ocho, aunque un testigo dijo que entre esas dos horas pasó por aquel sitio y no vió a Mercado, o a eso de las nueve, si como dijo el fiscal a eso de las diez fué que se le presentó el padre del interfecto, pues hubiera tenido tiempo de ir donde Señó Ramón, regresar al sitio y estar a las diez en Mayagüez.

Si la muerte ocurrió a eso de las nueve, aún estando el acusado en la Central Eureka a las seis de la tarde tuvo tiempo de llegar al lugar del crimen a eso de las ocho y media. Parece que el jurado resolvió el conflicto de la evidencia en cuanto a la hora que estuvo el padre en Mayagüez en el sentido de que fué cerca de las diez y por tanto que la muerte ocurrió cerca de las nueve. De todos modos, aún aceptando como más beneficioso para el acusado que el crimen ocurrió entre siete y ocho de la noche y aunque de este modo no resultan las dos horas y media que se emplean ordinariamente desde la Central Eureka hasta el lugar del crimen, nunca resultaría una imposibilidad física la de haberse trasladado de un sitio a otro en menos de dos horas y media; que es el tiempo normal, porque es posible que por algún medio haya emp'eado menos tiempo. Si la distancia hubiera sido tal que por ningún medio conocido de los hombres en esta época hubiera podido salvarse en menos de dos horas y media, entonces a pesar de toda la otra prueba de indicios habría que concluir que el acusado no pudo cometer ese crimen.

Es de notarse que aún cuando en el examen de los testigos no se hizo una detenida investigación respecto a las horas para llegar al conocimiento exacto de la hora en que fué agredido y muerto Mercado, la defensa suscitó ante el jurado la cuestión que estamos considerando pues el juez en sus instrucciones le dijo que la teoría de la defensa era que el acusado era inocente en absoluto porque no estaba en el sitio

del crimen sino en otro tan distante que no ha podido haber tomado participación en él, y se le llamó la atención a que se había introducido evidencia tendente a demostrar esa coartada, así como que al jurado tocaba resolver esa cuestión. Y en efecto la resolvió en contra del acusado al declarar que era el responsable de esa muerte.

Con la prueba del fiscal se negó el juez a ordenar al jurado la absolución perentoria que pidió el acusado, lo que demuestra que el juez entendió que dicha prueba era suficiente, si era creída, para que el acusado pudiera ser declarado culpable. La prueba que después de esa negativa presentó la defensa solamente tendió a contradecir alguna del fiscal y a sostener un cuñado del acusado que éste estuvo en un circo en la Eureka de ocho a ocho y media en la noche del crimen. En estas condiciones la prueba es que la corte concedió el nuevo juicio. ¿Debe sostenerse esa resolución?

Entendemos que el jurado resolvió con su veredicto condenatorio muchas cuestiones, entre ellas que el cuchillo que produjo la muerte era del acusado a pesar de su negativa, que este hecho con otros más demostraban por inferencia que el acusado fué el que causó la muerte de Mercado y que no era físicamente imposible que la produjera aunque fué visto en la Eureka de cinco y media a seis de la tarde y se tardase dos horas y media de allí al lugar de la muerte. Esta última cuestión fué especialmente sometida al jurado para su resolución y la decidió. ¿Cómo, pues, puede un juez contra el parecer unánime de los doce jueces de hecho decir que aquellos se equivocaron al decidir que el acusado pudo cometer el crimen y lo cometió, cuando como hemos dicho antes no era en absoluto físicamente imposible que el acusado recorriera la distancia entre la Eureka y el lugar del crimen en algo menos de dos horas y media?

Si se hubiera negado el nuevo juicio y el acusado hubiera traído ante nosotros su apelación fundada en la insuficiencia de la prueba, sin duda alguna hubiéramos declarado que había

prueba circunstancial suficiente para sostener su culpabili-
dad. ¿Cómo, pues, porque un juez, contra la opinión de doce,
declara que la prueba es insuficiente vamos a declarar noso-
tros que estuvo justificado en esa conclusión, base del nuevo
juicio concedido, cuando en esa apelación hubiéramos decla-
rado lo contrario?

Creemos, por tanto, que la prueba en el juicio no fué con-
traria al veredicto de culpabilidad rendido por el jurado y
que el juez inferior cometió un error manifiesto al declarar
lo contrario y al conceder por ese motivo un nuevo juicio.

Aún cuando la moción de nuevo juicio se fundó también
en errores de derecho cometidos por el juez durante el juicio,
ni el juez fundó en ellos su resolución, ni el acusado en su
alegato ante nosotros los argumenta, ni después de un cui-
dadoso estudio de ellos podemos declarar que existieron.

La resolución concediendo el nuevo juicio debe ser revo-
cada.