EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| Demeter International, Inc.<br><br>Peticionario<br><br>v.<br><br>Secretario de Hacienda<br><br>Recurrido | Certiorari<br><br>2018 TSPR 21<br><br>199 _____ |
|---|---|

Número del Caso: CC-2013-1036

Fecha: 12 de febrero de 2018

Tribunal de Apelaciones:

       Región Judicial de Bayamón

Abogados de la parte Peticionaria:

       Lcdo. Luis P. Costas Elena
       Lcdo. Roberto Alonso Santiago
       Lcdo. José A. Andreu Fuentes
       Lcdo. Pedro López Bergollo

Oficina de la Procuradora General:

       Lcda. Margarita Mercado Echegaray
       Procuradora General

       Lcda. Carmen Riera Cintrón
       Procuradora General Auxiliar

       Lcdo. Carlos Fontán Meléndez
       Procurador General Auxiliar

Derecho tributario: Facultad del Secretario del Departamento de Hacienda de realizar acuerdos sobre el pago de contribuciones sobre periodos que hayan sido tasados o investigados.

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Demeter International, Inc.

    Peticionario

                         CC-2013-1036     *Certiorari*

      v.

Secretario de Hacienda

    Recurrido

Opinión del Tribunal emitida por el Juez Asociado señor COLÓN PÉREZ.

En San Juan, Puerto Rico a 12 de febrero de 2018.

En el presente caso nos corresponde determinar si el Departamento de Hacienda, a través de su Secretario, y dentro de la facultad que este último tiene para realizar acuerdos finales sobre el pago de contribuciones, puede incluir, como parte de los acuerdos, periodos contributivos que no han sido tasados o sobre los cuales no se ha realizado una investigación de la deuda contributiva. Ello, conforme lo exige nuestro ordenamiento legal y reglamentario en materia de derecho tributario.

Al examinar detenida y cuidadosamente las disposiciones legales y reglamentarias que gobiernan estos asuntos, así como las particularidades de los hechos ante nuestra consideración, adelantamos que el

Departamento de Hacienda, a través de su Secretario, tiene facultad para realizar acuerdos sobre el pago de contribuciones, solamente sobre aquellos periodos que hayan sido previamente tasados o investigados. Veamos.

I.

El pasado 24 de febrero de 2011, *Demeter International, Inc.* (en adelante "Demeter") presentó una demanda donde solicitaba que se declararan nulas, se cancelaran y se dejaran sin efecto ciertas deficiencias contributivas, para los años 1996 al 2003 aproximadamente, según notificadas por el Departamento de Hacienda. En apretada síntesis, Demeter alegó que las deficiencias imputadas no se basaban en su realidad contributiva, ya que dicha empresa no había recibido los ingresos que le imputaba el Departamento de Hacienda, ni llevó a cabo los negocios que se alegaban en las referidas deficiencias. Sostuvo, en la alternativa, que, de existir tales deficiencias, la acción para cobrar las mismas estaba prescrita, por lo que no podrían ser cobradas. Demeter también señaló que la deuda imputada se fundó en información y documentos solicitados y obtenidos a través de terceros (bancos e instituciones financieras), sin haberle sido notificados tales requerimientos; lo anterior, en alegada violación al Art. II, Sec. 10 de la Constitución del Estado Libre Asociado de Puerto Rico. LPRA, Tomo 1, Ed. 2016, pág. 336.

Así las cosas, y luego de varios trámites procesales no necesarios aquí pormenorizar,[1] Demeter y el Departamento de Hacienda informaron al foro primario que habían suscrito un acuerdo transaccional que buscaba ponerle fin al pleito. Dicho acuerdo, con fecha del **15 de junio de 2012**, en lo aquí pertinente, dispuso lo siguiente:

> Por la presente se le entrega cheque por la cantidad de $32,020.00 **en pago global y total para el pago, saldo y cierre de todos los años de DEMETER INTERNATIONAL, INC. (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), incluyendo los años 1996 al 2003.**
>
> Con este pago entendemos que usted nos asegura completa paz y tranquilidad, y que usted nos entregará dentro de los próximos días certificación negativa de toda deuda. Queda acordado que con su aceptación de esta cantidad, que usted eliminará de inmediato y queda sin efecto toda imputación y tasación contra el contribuyente por concepto de contribución sobre ingresos, y el contribuyente nada adeuda al erario público.
>
> Favor de firmar abajo en aceptación de este Acuerdo.[2]

---

[1] En síntesis, junto a la demanda, Demeter sometió una "*Moción y Solicitud para Reducción y/o Exoneración de Fianza que Acompaña la Demanda*". Adujo que la fianza exigida por el Departamento de Hacienda, y requerida en aquellos casos en que se presente una demanda de impugnación de deficiencias, era exagerada e ilegal, y estaba diseñada para privar a la parte demandante del debido proceso de ley, de su derecho a ser oído y de tener su día en corte.

Por su parte, el Departamento de Hacienda presentó una solicitud de desestimación, tras alegar que Demeter había incumplido con el requisito jurisdiccional de prestar una fianza, previo a la radicación de su demanda. Señaló que dicho requisito era parte del debido proceso de ley que el *Código de Rentas Internas*, *infra*, le concede a todo contribuyente que quiera impugnar unas deficiencias contributivas; por lo que la parte demandante estaba llamada a cumplir con ello. Por ello, solicitó la desestimación del pleito.

Tras evaluar los argumentos de las partes, el foro primario denegó la misma, relevando así a Demeter del pago de la referida fianza. Dicha determinación advino final y firme.

[2] *Véase* Apéndice IX de la Petición de *Certiorari*, pág. 250. (Énfasis suplido).

De conformidad con lo anterior, y durante una vista transaccional celebrada el 30 de octubre de 2012, las partes le informaron al Tribunal de Primera Instancia que habían estipulado el contenido del referido acuerdo. De la minuta correspondiente a dicha vista se desprende lo siguiente:

> El licenciado Román Rodríguez[, representante legal de Demeter,] informa que las partes llegaron a una estipulación.
>
> De la misma surge que se debe cumplir con la eliminación de las imputaciones de deuda contributiva, emitir las certificaciones negativas desde 1996 hasta el presente y devolver los documentos ilegalmente obtenidos que le dan base a la radicación del presente caso.[3]

Posteriormente, el 5 de noviembre de 2012, Demeter presentó una *Moción Urgente para Vista Evidenciaria*. En lo concerniente a la controversia que nos ocupa, adujo que el Departamento de Hacienda no había eliminado las imputaciones de deuda en su contra ni había devuelto los documentos obtenidos en violación al debido proceso de ley y a los acuerdos verbales informados durante la vista transaccional. Solicitó al foro primario que señalara una vista evidenciaria y que, en su día, dictara sentencia a su favor.

Así pues, el 16 de noviembre de 2012 el Tribunal de Primera Instancia celebró una vista de seguimiento en el caso. En ésta, Demeter indicó que había recibido lo que entendía era el cumplimiento parcial con la orden del Tribunal. Señaló que faltaba constancia de haberse cumplido la primera estipulación a la que llegaron las partes,

---

[3] *Véase* Apéndice I de la Petición de *Certiorari*, págs. 120-121.

relativa a la eliminación de las imputaciones de deuda contributiva. A tales efectos, sostuvo que existía una forma que utiliza el Departamento de Hacienda, titulada *Memorando de Cancelación y Ajustes de Deuda (Formulario SC2625)*, en donde se acredita que la deuda se ha eliminado en los autos de la referida agencia gubernamental, pero la misma no le había sido entregada. Alegó, además, que lo que recibió fue una certificación negativa de deuda desde 1996 al presente. Demeter expresó, además, que esa información estaba incluida en un documento titulado *Certificación de Deuda*, que aunque rezaba que no existía deuda hasta ese momento, no estaba satisfecha con el contenido de la misma porque en dicho documento se incluyó la siguiente "coletilla": ***"[e]sta certificación no incluye deudas pendientes por tasar o en proceso de investigación por el negociado impositivo a la fecha de esta certificación"***.[4]

El Departamento de Hacienda, por su parte, expresó que había expedido una certificación de deuda para los años contributivos 1998 y 1999, los únicos dos periodos contributivos que reflejaban deudas atribuibles a Demeter para el periodo en que se demandó. Sostuvo, además, que dicha certificación implicaba que hasta el momento de su emisión no surgía ningún tipo de deuda y que dicha advertencia con la que Demeter no estaba de acuerdo, se usaba en los documentos oficiales emitidos por la agencia.

---

[4] *Véase* Apéndice I de la Petición de *Certiorari*, pág. 46.

Evaluados los planteamientos de las partes, el Tribunal de Primera Instancia hizo constar que, si bien se cumplió con la presentación de la certificación, no se acreditó la cancelación de la deuda en cuestión. Acto seguido, el Departamento de Hacienda se reiteró en que el sistema reflejaba dos deudas -- la de 1998 y 1999, respectivamente, -- y que la certificación negativa lo que indicaba era que hasta el momento de su emisión, en sus sistemas no había deuda reflejada. Demeter, por su parte, argumentó que no había razón para no expedir el *Memorando de Cancelación y Ajustes de Deuda (Formulario SC2625)*. El foro primario hizo constar que incluiría en la sentencia la *Certificación Negativa* emitida por el Departamento de Hacienda y, si en la eventualidad aparecía la deuda, se ordenaría al Secretario de Hacienda comparecer al tribunal.

De otra parte, Demeter solicitó al tribunal una orden requiriendo al Departamento de Hacienda el *Memorando de Cancelación y Ajuste de Deuda (Formulario SC2625)*, a lo que el Tribunal accedió. El foro primario señaló, además, otra vista de seguimiento para el 18 de diciembre de 2012.

El 16 de noviembre de 2012, el mismo día en que se celebró la vista de seguimiento antes mencionada, el Departamento de Hacienda presentó una *Moción en Cumplimiento de Orden*. Mediante ésta, le informó al foro primario que había preparado la *Certificación Negativa de Deuda* de Demeter de noviembre de 2012, en la cual se especificaba que -- a la

fecha antes señalada -- la referida empresa no tenía deudas tasadas por concepto de contribuciones sobre ingresos, patronal y arbitrios. Además, informó que se le hizo entrega a Demeter, a través de su representante legal, de los documentos que entregaron las instituciones financieras.

Así las cosas, el 18 de diciembre de 2012 se celebró una nueva vista de seguimiento. De la minuta de dicha vista se desprende que -- a tenor con el acuerdo suscrito entre las partes -- el Departamento de Hacienda produjo un "*Memorando de Cancelación y Ajuste de Deuda*" (Formulario SC2625), correspondiente al año 1999 e informó que le faltaba por producir el memorando correspondiente al año 1998, por lo que solicitó un término para producir el mismo. El Tribunal le concedió hasta el 10 de enero de 2013 para informar si cumplió con el documento acreditativo de cancelación para el año 1998, luego de lo cual procedería a dictar sentencia. Demeter, por su parte, solicitó al Tribunal de Primera Instancia que, al momento en que se dictara sentencia, **apareciera en ésta que no existía deficiencia alguna por parte de la referida empresa desde 1996 hasta el 2012, años que formaron parte del acuerdo firmado por las partes.**[5]

Oportunamente, Demeter alegó que el Departamento de Hacienda no había cumplido con las órdenes del Tribunal de Primera Instancia, pues no había producido evidencia de la

---

[5] *Véase* Apéndice I de la Petición de *Certiorari*, págs. 159-161.

cancelación de las deudas para el año 1998, además de no haber devuelto la totalidad de los documentos obtenidos ilegalmente. Sostuvo que el Departamento de Hacienda había realizado ciertas estipulaciones ante el Tribunal, por lo que procedía dictar sentencia según lo solicitado por ésta.

Días más tarde, el Departamento de Hacienda le informó al foro primario que, según requerido, había notificado a Demeter, vía facsímil, el "*Memorando de Cancelación y Ajuste de Deuda, Modelo - SC2625*". Al así hacerlo, hizo hincapié en que las únicas deudas contributivas que aparecían en su sistema, en relación a Demeter, eran aquellas correspondientes a los años contributivos 1997, 1998 y 1999, respectivamente. Además, indicó que, según se desprendía de la *Certificación Negativa de Deuda* que constaba en el expediente, Demeter no contaba con deudas contributivas en el Departamento de Hacienda. Por último, informó que el acuerdo entre Demeter y el Departamento de Hacienda fue de conformidad con los postulados esbozados en la Ley Núm. 218-2011, conocida como *Ley para el Fortalecimiento de la Seguridad y Salud Pública*, 12 LPRA sec. 8031, *et seq.*, según enmendada, y, por lo tanto, solicitó el archivo y sobreseimiento del litigio.

A dicha solicitud, Demeter se opuso. Arguyó que la eliminación de las deudas realizadas por el Departamento de Hacienda, contrario a lo señalado por este último, no fue consistente con los supuestos de la Ley Núm. 218-2011, según

enmendada, y solicitó que se dictara sentencia sumaria a su favor. Sostuvo que para los años de 1996 al 2003 no obtuvo utilidades o beneficios, sino pérdidas netas, cuyas cuantías para cada año contributivo mencionó en dicho escrito. Añadió que el Secretario de Hacienda suscribió un *"Acuerdo Final"* o *"Closing Agreement"* que establecía que mediante el pago de $32,020.00, se dejaría sin efecto toda imputación y tasación contra el contribuyente, incluyendo el periodo de 1996 al 2003.

Ante ello, y luego de evaluar los planteamientos de las partes, el Tribunal de Primera Instancia dictó sentencia. En ésta consignó que, en vista de que el Departamento de Hacienda produjo unos *"Memorandos de Cancelación y Ajuste de Deudas, Modelo – SC2625"* para los años 1998 y 1999, así como una *Certificación de Deuda* con fecha del 14 de noviembre de 2012, en la que se especificaba que Demeter no tenía deudas tasadas por concepto de contribuciones sobre ingresos, procedía desestimar con perjuicio la demanda instada por Demeter. En dicha determinación, el foro sentenciador, además, estableció que el Departamento de Hacienda estaba impedido de notificar deficiencias con anterioridad al 14 de noviembre de 2012.

Insatisfecho con dicho proceder, Demeter solicitó la reconsideración del mencionado dictamen. La empresa sostuvo que la Sentencia emitida fue el resultado del acuerdo final alcanzado entre las partes, por lo que, lo que procedía, en

estricto derecho, era dictar una sentencia declarando *Ha Lugar* la demanda por acuerdo y/o estipulación de las partes, en lo que al asunto de las deudas contributivas respecta.

El Departamento de Hacienda también solicitó reconsideración. Sostuvo que no estaba conforme con aquella parte de la sentencia que concluye que está impedido de notificar deficiencias a Demeter con anterioridad al 14 de noviembre de 2012. Indicó que la fecha plasmada en la *Certificación de Deuda* de la mencionada empresa -- entiéndase, el 14 de noviembre de 2012, -- no debía interpretarse como punto de referencia para disponer que, hasta dicha fecha, el Departamento de Hacienda no podía notificar deficiencias al contribuyente. Señaló que la fecha de la certificación lo que establece es que, a ese preciso momento, el contribuyente no reflejaba deuda alguna tasada con Hacienda, pero ello no imposibilitaba a la agencia notificar deficiencias con anterioridad a la fecha indicada en el documento. Sostuvo que este caso versaba sobre los años contributivos 1996 al 2003 y que, de dicho periodo, Demeter sólo tenía deudas para los años 1998 y 1999. Explicó que el Departamento de Hacienda canceló las referidas deudas, dando lugar a que se produjera la certificación negativa que fue expedida el 14 de noviembre de 2012. En atención a lo anterior, solicitó al tribunal que enmendara la sentencia a los fines de establecer que la agencia gubernamental estaba

impedida de notificar deficiencias a Demeter únicamente para los años comprendidos entre el 1996 y 2003.

Del expediente que obra en nuestro poder surge que, previo a que la moción de reconsideración presentada por el Departamento de Hacienda fuera atendida, el Tribunal de Primera Instancia dictó una *Resolución* en la que declaró *Ha Lugar* la moción de reconsideración presentada por Demeter. Al así proceder, dicho foro reconsideró el dictamen y, en consecuencia, emitió una sentencia enmendada en la que consignó que la demanda radicada en el pleito de epígrafe se declaraba *Ha Lugar* por estipulación de las partes.

Ante este escenario, y por entender que al momento de dictar sentencia enmendada el Tribunal de Primera Instancia no había tenido oportunidad de evaluar su moción de reconsideración, el Departamento de Hacienda presentó una nueva moción de reconsideración en la que reiteraba, por referencia, los planteamientos presentados en la primera moción a tales efectos. La misma fue declarada *No Ha Lugar*.

Inconforme con tal determinación, el Departamento de Hacienda recurrió ante el Tribunal de Apelaciones mediante la presentación de una *Apelación*. En síntesis, señaló que el foro primario erró al determinar que dicha agencia estaba impedida de notificar deficiencias a Demeter, correspondientes a los periodos contributivos de 2004 a 2012. Expresó que, a tenor con la Sentencia del foro primario, el Estado estaría renunciando a ejercer la autoridad delegada

para imponer y cobrar contribuciones, conforme a las leyes fiscales aplicables, para años contributivos que ni siquiera aparecen tasados en el sistema o que no han sido objeto de investigación.

Oportunamente, Demeter se opuso a la *Apelación*. En esencia, expuso que la interpretación clara y literal del acuerdo final en cuestión demuestra que la intención de las partes fue finiquitar toda responsabilidad contributiva desde el 1996 hasta la fecha en que suscribieron el acuerdo; entiéndase, en el año 2012. En ese sentido, sostuvo que el Departamento de Hacienda, a través de su Secretario, está ampliamente facultado para realizar acuerdos finales sobre cualquier periodo contributivo, incluyendo aquellos años que no hayan sido tasados y para los cuales aún no se haya notificado una deficiencia.

Examinados los planteamientos de ambas partes, el foro apelativo intermedio dictó sentencia. Al así hacerlo, revocó el dictamen del Tribunal de Primera Instancia y concluyó que, **por consideraciones de orden público[6]**, el acuerdo

---

[6] En particular, el foro apelativo intermedio expresó lo siguiente:

> Una revisión del expediente ante nuestra consideración nos obliga a concluir que el acuerdo transaccional suscrito por las partes no se extendió más allá del año 2003. Sabemos, sin embargo, que la ley impone al Departamento de Hacienda unos límites para la investigación y cobro de deudas contributivas. Más allá de estos límites que impone el ordenamiento, y de los límites autoimpuestos por [el Departamento de] Hacienda al suscribir el acuerdo, no es procedente ninguna otra limitación al deber legal del Departamento de Hacienda de imponer y cobrar deficiencias contributivas. *Véase* Sentencia del Tribunal de Apelaciones, Apéndice X de la Petición de *Certiorari*, pág. 282.

suscrito entre las partes no se extendió más allá del año 2003.

Inconforme con tal determinación, Demeter acude ante nos mediante el recurso que nos ocupa. En esencia, aduce que el Tribunal de Apelaciones erró al no reconocer que el Secretario de Hacienda tiene facultad para realizar acuerdos finales sobre periodos no tasados y no investigados y, además, al limitar los años contributivos comprendidos en el acuerdo que éste suscribió con el Departamento de Hacienda.

En oposición, el Departamento de Hacienda adujo, en apretada síntesis, que el Secretario de Hacienda ostenta la facultad de realizar acuerdos finales con los contribuyentes. No obstante, alegó que tales acuerdos no pueden incluir periodos contributivos que no han sido previamente tasados ni investigados por el ente gubernamental.

Trabada así la controversia y con el beneficio de la comparecencia de ambas partes, procedemos a resolver.

II.

Como es sabido, en nuestra jurisdicción, el poder que posee el Estado de imponer y cobrar contribuciones, el cual radica en la Asamblea Legislativa, emana del Art. VI, Sec. 2, de la Constitución del Estado Libre Asociado de Puerto Rico. Al respecto, la mencionada disposición constitucional establece que:

> [e]l poder del Estado Libre Asociado para imponer y cobrar contribuciones y autorizar su imposición y cobro por los municipios, se ejercerá según se disponga por la Asamblea Legislativa, y nunca será rendido o suspendido. Art. VI, sec. 2, Const. ELA, LPRA, Tomo 1, Ed. 2016, pág. 435.

Dicho poder ha sido reconocido como el más fundamental entre sus poderes públicos y gubernamentales. *Díaz Rivera v. Srio. de Hacienda*, 168 DPR 1, 14 (2006); *Burlington Air Exp., Inc. v. Mun. Carolina*, 154 DPR 588, 597 (2001); *R.C.A. v. Gobierno de la Capital*, 91 DPR 416, 428 (1964). Se trata de un poder que es esencial y vital para la subsistencia y supervivencia del Estado político, por lo que se perfila como uno de naturaleza amplia y abarcadora. *Díaz Rivera v. Srio. de Hacienda, supra,* a la pág. 14; *Burlington Air Exp. Inc. v. Mun. Carolina, supra*, a la pág. 597; *Continental Ins. Co. v. Sec. De Hacienda*, 154 DPR 146, 150-151 (2001); *F.D.I.C. v. Mun. de San Juan*, 134 DPR 385, 390-391 (1993).

En virtud del referido poder constitucional, a lo largo de nuestra historia, la Asamblea Legislativa ha impuesto diversos tipos de contribuciones. Asimismo, mediante diferentes estatutos fiscales, ha autorizado al Secretario de Hacienda a tasar y cobrar las mismas. *Díaz Rivera v. Srio. de Hacienda, supra*, a la pág. 15. El Secretario de Hacienda, como funcionario designado por ley para la administración y contabilidad de fondos públicos, así como para el cobro de contribuciones al erario, tiene el deber legal de realizar las gestiones de cobro conducentes a dicho fin, a tenor con las disposiciones contenidas en los estatutos fiscales.

Así pues, entre los años 1996 y 2003, fechas para las cuales alegadamente se le habían notificado deficiencias contributivas a Demeter, el cobro de contribuciones en nuestro país estaba regulado por el *Código de Rentas Internas de Puerto Rico de 1994* (derogado). En el referido Código, la Asamblea Legislativa de Puerto Rico además de establecer todo lo relacionado al cobro de contribuciones, facultó al Secretario del Departamento de Hacienda a, entre otras cosas, realizar **acuerdos finales** respecto a cualquier contribución impuesta en virtud del referido cuerpo normativo. Sobre el particular, la Sec. 6126 del *Código de Rentas Internas de 1994*, señalaba lo siguiente:

Acuerdos Finales

(a) Facultad. - El Secretario o su representante autorizado queda facultado para formalizar un acuerdo por escrito con cualquier persona relacionado a la responsabilidad de dicha persona, o de la persona o sucesión a nombre de quien actúe, con respecto a cualquier contribución impuesta por este Código para cualquier período contributivo.

(b) Finalidad. - Dicho acuerdo, una vez formalizado, será final y concluyente y, excepto cuando se demostrare fraude o engaño, o falseamiento de un hecho pertinente-

(1) El caso no será reabierto en cuanto a las materias acordadas ni el acuerdo modificado por funcionario, empleado o agente alguno del Estado Libre Asociado de Puerto Rico, y

(2) Dicho acuerdo, o cualquier determinación, tasación, cobro, pago, reducción, reintegro o crédito hecho de conformidad con el mismo, no serán anulados, modificados, dejados sin efecto o ignorados en litigio, acción o procedimiento alguno.

(c) Penalidades. – Las penalidades por violaciones con respecto a acuerdos finales están contenidas en la sección 6053 de este Subtítulo. 13 LPRA ant. sec. 8126.

De la discusión que antecede, se desprende que no existe duda alguna sobre la facultad del Secretario de Hacienda para suscribir Acuerdos Finales. Es decir, tal y como surge de la referida sección, en virtud del poder conferido al Secretario de Hacienda, éste quedaba facultado para llegar a acuerdos finales, por escrito, con cualquier persona -- natural o jurídica -- en cuanto a la responsabilidad contributiva de ésta, para cualquier periodo contributivo. Así, un acuerdo alcanzado en virtud de la mencionada facultad sería final y concluyente.

Ahora bien, precisa señalar que el *Código de Rentas Internas de 1994*, aplicable a la controversia ante nos, fue derogado y posteriormente sustituido por la Ley Núm. 1-2011, también conocida como *Código de Rentas Internas de Puerto Rico de 2011*, 13 LPRA sec. 30011 *et seq.* (en adelante, "*Código de Rentas Internas de 2011*"). En éste, y de forma idéntica a lo contemplado en el *Código de Rentas Internas de 1994*, el legislador también autorizó al Departamento de Hacienda, a través de su Secretario, a realizar **acuerdos finales** con los contribuyentes.

En particular, la sec. 6051.07 del *Código de Rentas Internas de 2011*, faculta al Secretario de Hacienda, o a su representante autorizado, para realizar un acuerdo por escrito con cualquier persona con respecto a cualquier

contribución impuesta por el Código, para cualquier período

contributivo. Al respecto, y en lo pertinente, la referida

disposición legal, según enmendada, establece que:

Acuerdos Finales

(a) Facultad. - El Secretario o su representante autorizado queda facultado para formalizar un acuerdo por escrito con cualquier persona relacionado a la responsabilidad de dicha persona, o de la persona o sucesión a nombre de quien actúe, con respecto a cualquier contribución impuesta por este Código para cualquier período contributivo. Disponiéndose, que en un acuerdo final el Secretario no podrá:

(1) Aceptar, luego del 30 de junio de 2016, pagos de contribuciones futuras que no sean adeudadas por el contribuyente al momento de otorgar el acuerdo final;

(2) conceder o aplicar a una transacción cubierta por el acuerdo final tasas preferenciales o menores a las establecidas en este Código o en cualquier ley especial aplicable a la misma;

(3) conceder o aplicar deducciones o créditos contributivos que no estén permitidos por este Código o por cualquier ley especial aplicable;

(4) clasificar como sobrepago o aplicar como sobrepago una cantidad que no consista de contribuciones previamente pagadas;

(5) extender periodos de prescripción, excepto según se permita en este Código;

(6) condonar intereses o recargos, excepto según se permita en este Código;

(7) modificar la base ni el monto de la ganancia en la venta de activos, de manera contraria a lo establecido en este Código;

(8) eximir del requisito de radicación de planillas, a menos que la planilla sea parte del y se acompañe con el acuerdo final; u

(9) otorgar acuerdos sobre materias o asuntos para los cuales no esté expresamente autorizado a ejercer su discreción.

(b) Finalidad. - Dicho acuerdo, una vez formalizado, será final y concluyente y, excepto cuando se demostrare fraude o engaño, o falseamiento de un hecho pertinente:

(1) El caso no será reabierto en cuanto a las materias acordadas ni el acuerdo modificado por funcionario, empleado o agente alguno del Gobierno de Puerto Rico, y

(2) dicho acuerdo, o cualquier determinación, tasación, cobro, pago, reducción, reintegro o crédito hecho de conformidad con el mismo, no serán anulados, modificados, dejados sin efecto o ignorados en litigio, acción o procedimiento alguno.

(c) Todo acuerdo final establecerá expresamente que aquellas disposiciones relacionadas o aplicables a eventos contributivos ocurridos luego de la firma del acuerdo estarán sujetas a cualquier enmienda de ley aprobada luego de la fecha de la firma del referido acuerdo.

(d) Penalidades. - Las penalidades por violaciones con respecto a acuerdos finales están contenidas en la Sección 6030. [sic] de este título.

(e) El Secretario establecerá un registro de acuerdos finales identificando cada acuerdo por contribuyente. Cada contribuyente podrá tener acceso al registro cibernéticamente y solamente tendrá acceso a aquellos acuerdos que hubiese otorgado con el Departamento de Hacienda. 13 LPRA sec. 33207.

Asimismo, el referido estatuto establece que aquellos acuerdos finales que se otorguen luego del 31 de diciembre de 2010, con relación a años contributivos que comenzaron antes del 1 de enero de 2011, se regirán por las correspondientes disposiciones del *Código de Rentas Internas de 1994*. 13 LPRA sec. 33366(a). De otra parte, los acuerdos

finales a ser efectuados con posterioridad al 31 de diciembre de 2010, se regirán por las disposiciones del *Código de Rentas Internas de 2011*. 13 LPRA sec. 33366(b).

Así las cosas, por tratarse el caso ante nuestra consideración de un acuerdo final realizado en el 2012, sobre periodos contributivos entre los años 1996 y el 2003, incluso, procede disponer de este asunto a la luz de las disposiciones aplicables del *Código de Rentas Internas de Puerto Rico de 1994*, *supra*, las cuales, como ya vimos, resultan, en extremo, similares a las contenidas en el *Código de Rentas Internas de Puerto Rico de 2011*, *supra*.

De hecho, en cuanto al alcance de los acuerdos finales, las disposiciones antes citadas provienen de la Ley Pública Núm. 99-514, conocida como *Código de Rentas Internas Federal de 1986*, 26 USC sec. 1 *et seq*. (en adelante, "*Código de Rentas Internas Federal*") donde también se le concede al Secretario del Tesoro idéntica facultad de firmar **acuerdos finales** para cualquier periodo contributivo. En particular, y en lo que aquí compete, el *Código de Rentas Internas Federal* dispone lo siguiente:

*Closing agreements*

*(a) Authorization. — The Secretary is authorized to enter into an agreement in writing with any person relating to the liability of such person (or of the person or estate for whom he acts) in respect of any internal revenue tax for any taxable period.*

*(b) Finality. — If such agreement is approved by the Secretary (within such time as may be stated in such agreement, or later agreed to)*

*such agreement shall be final and conclusive, and, except upon a showing of fraud or malfeasance, or misrepresentation of a material fact-*

> *(1) the case shall not be reopened as to the matters agreed upon or the agreement modified by any officer, employee, or agent of the United States, and*

> *(2) in any suit, action, or proceeding, such agreement, or any determination, assessment, collection, payment, abatement, refund, or credit made in accordance therewith, shall not be annulled, modified, set aside, or disregarded.* 26 USCA sec. 7121.

Es a raíz de lo anterior que las secciones 6126 del *Código de Rentas Internas de 1994, supra,* y 6051.07 del *Código de Rentas Internas del 2011*, *supra*, así como la Sec. 7121 del *Código de Rentas Internas Federal, supra,* resultan particularmente útiles para la correcta disposición de las controversias ante nuestra consideración. Ahora bien, ante la ausencia en nuestra jurisdicción de interpretaciones de las secciones de los estatutos locales aquí en controversia -- particularmente, en torno al alcance del concepto "*acuerdos finales*", -- resulta altamente ilustrativo repasar las interpretaciones que sobre el tema han realizado varios tratadistas y tribunales federales sobre la Sección 7121 del *Código de Rentas Internas Federal, supra*.

A grandes rasgos, bajo la Sec. 7121 del *Código de Rentas Internas Federal*, *supra*, un acuerdo final (*closing agreement*) constituye un acuerdo escrito entre un contribuyente y el *Servicio de Rentas Internas* (IRS, por sus siglas en inglés), en el que se pone fin a la responsabilidad

contributiva del primero respecto a cierto periodo contributivo.[7] Si el acuerdo final es aceptado tanto por el contribuyente como por el IRS o la persona a quien éste delegue tal responsabilidad, el referido acuerdo es final y concluyente, a menos que se demuestre que medió fraude o que se falseó intencionalmente un hecho esencial por una de las partes.[8] La decisión de firmar un acuerdo final queda a la total discreción del IRS.[9]

Dicha agencia gubernamental puede entrar en este tipo de acuerdo cuando: 1) es ventajoso para el IRS tener cierto asunto contributivo totalmente concluido o, 2) el contribuyente ha demostrado buenas y suficientes razones para el acuerdo y el gobierno no sufrirá ninguna desventaja por su consumación.[10] Un acuerdo final puede estar relacionado con una responsabilidad contributiva para pasados años contributivos o relacionado con elementos específicos de años pasados o futuros.[11] Por último, en el

---

[7] *Véase* 14A Mertens Law of Fed. Income Tax'n § 52.3. ("*A closing agreement is a written agreement between an individual and the Commissioner which settles or 'closes' the liability of that individual (or taxpayer or estate for whom he acts) with respect to any Internal Revenue tax for any taxable period.*").

[8] *Íd.* ("*If the agreement is signed and accepted by the Commissioner or his delegate, the agreement is final and conclusive as to both the taxpayer and the Service.*").

[9] *Íd.* ("*The decision to sign a closing agreement is within the discretion of the Service.*").

[10] *Íd.* ("*Closing agreements will be entered into when: (1) it is advantageous to the Service to have the tax matter permanently and conclusively closed or (2) a taxpayer can show good and sufficient reason for the agreement and the Government will sustain no disadvantage by its consummation.*").

[11] *Íd.* ("*A closing agreement may relate to tax liability for a past taxable year or relate to specific items in past or future years.*").

ámbito federal se exige que el referido acuerdo sea reducido a escrito, en términos explícitos y que cumpla con todos los requerimientos que impone el Código de Rentas Internas Federal, *supra*.[12]

Respecto a la facultad del IRS para llegar a acuerdos finales sobre deudas para pasados años contributivos o relacionadas con elementos específicos de años pasados o futuros, prestigiosos tratadistas del tema han sostenido que el derogado *Código de Rentas Internas Federal de 1928* –– el cual gobernaba los asuntos relacionados con acuerdos finales –– proveía para realizar este tipo de acuerdo con respecto a deudas contraídas para periodos contributivos que finalizaban antes del día del acuerdo.[13] No obstante, el *Código de Rentas Internas Federal de 1938* permitió, desde esa fecha, entrar en acuerdos finales con respecto a deudas para cualquier periodo contributivo.[14] Este cambio permite al IRS suscribir acuerdos finales con respecto a transacciones contributivas que ya ocurrieron, que pudieran afectar la responsabilidad contributiva para años futuros, así como acuerdos finales relacionados a transacciones

---

[12] *Íd*. ("*A closing agreement must be in writing, contain explicit terms and meet all of the requirements of the statute.*").

[13] *Véase* 14A Mertens Law of Fed. Income Tax'n § 52.2. ("*The 1928 Act governing closing agreements provided that they could only be used 'in respect to any internal revenue tax for any taxable period ending prior to the date of the agreement.'*").

[14] *Íd*. ("*However, the Code was changed in 1938 to allow closing agreements to be entered into "in respect to any internal revenue tax for any taxable period.*").

contributivas que no se han consumado al momento del acuerdo.[15] **Sin embargo, un acuerdo final suscrito bajo estas disposiciones no concluye asuntos no cubiertos en el mismo.**[16]

En aras de comprender lo anteriormente citado, es menester señalar que, para fines del *Código de Rentas Internas Federal*, un "*periodo contributivo*" incluye un año contributivo, o parte del mismo, que haya transcurrido, o un año contributivo que esté abierto.[17]

De otra parte, el término "*año contributivo*" significa el año calendario, o el año fiscal dentro del año calendario, sobre el cual los ingresos contributivos son **computados**.[18]

Sobre la interpretación del contenido y los alcances de los acuerdos finales, en *Marathon Oil Company v. United States*, 42 Fed. Cl. 267, 274 (1998) -- uno de los pocos casos que atiende este tema, -- se señaló que los acuerdos finales al amparo del *Código de Rentas Internas Federal*, están autorizados y limitados por el propio estatuto que los regula. Es decir, en todo aquello en que el estatuto

---

[15] *Íd.* ("*This change allows the Commissioner and taxpayers to enter into closing agreements with respect to transactions which have already occurred, which could affect tax liability for future years, as well as closing agreements concerning transactions not yet consummated at the time of the agreement.*").

[16] *Véase* Boris I. Bittker & Lawrence Lokken, *Federal Taxation of Income, Estates and Gifts*, 112.1A.3. ("*A closing agreement does not, however, conclude matters not covered by the agreement […]*").

[17] *Véase* 14A Mertens Law of Fed. Income Tax'n § 52.6. ("*A closing agreement may relate to any taxable period including a past taxable year or part of a year, or an open taxable year. However, the year in which a deduction, for example, is taken must be included in the agreement.*").

[18] 26 U.S.C.A. § 7701 (23). ("*The term 'taxable year' means the calendar year, or the fiscal year ending during such calendar year, upon the basis of which the taxable income is computed under [the statute].*").

contradiga las disposiciones de la teoría general de contratos, prevalecerán las especiales. **No obstante, se aclaró que los acuerdos finales no dejan de ser contratos, por lo que al analizar los mismos, se deben utilizar los principios generales de contratación.** Así pues, a pesar de que los tribunales no pueden variar o alterar los términos de un acuerdo final, sí es posible que se invoquen los principios generales de contratación para interpretar los términos del mismo. *Íd.* en la pág. 275.[19]

Por lo tanto, en caso de que surja alguna controversia respecto a un acuerdo final, éste debe ser interpretado utilizando la doctrina general de contratos. Al respecto, en *S & O Liquidating P'ship v. C.I.R.*, 291 F.3d 454, 458-459 (2002), se señaló que:

> *A duly approved closing agreement, signed by the participating individuals, is a contract that is governed by federal common law and is interpreted under standard principles of contract law— more precisely, the core principles of the common law of contract that are in force in most states. Thus, if a closing agreement's terms are clear and unambiguous, we are obligated to enforce the language as it is written, without resort to extrinsic evidence or interpretive devices, such as a letter from a party's attorney purporting to*

---

[19] Específicamente, se dispuso lo siguiente:

Closing agreements are authorized, and limited by, the language of the statute. To the extent that the statute conflicts with general and otherwise governing contract law principles, the statute governs. But closing agreements are contracts nonetheless, and courts have repeatedly stated that, in analyzing closing agreements, the court must use ordinary contract principles. (Referencias internas omitidas). *Marathon Oil Co. v. U.S.*, 42 Fed. Cl. 267 (1988), citando con aprobación a *United States v. Lane,* 303 F.2d 1, 4 (5th Cir. 1962), *appeal after remand* 328 F.2d 602 (5th Cir. 1964); *Rink v. Commissioner*, 100 T.C. 319, 1993 WL 101372 (1993); *In re Spendthrift Farm*, 931 F.2d 405, 407 (6th Cir. 1991).

*attach a hidden meaning to anything therein.* (Citas internas omitidas).

Así pues, de conformidad con lo antes señalado y en aras de interpretar correctamente el alcance del acuerdo en controversia, resulta necesario -- similar a como se ha hecho en la jurisdicción federal -- entrar a analizar la teoría general de contratos que impera en nuestro ordenamiento jurídico. Recordemos que "[l]a validez y el cumplimiento de los contratos no puede dejarse al arbitrio de las partes". Art. 1208 del Código Civil, 31 LPRA, Sec. 3373. *Véase,* además*, Adorno Quiles v. Hernández,* 126 DPR 191, 194 (1990). Le corresponde, pues, al Poder Judicial resolver las controversias contractuales que presenta este tipo de caso. Procedemos a así hacerlo.

III.

*A. Teoría General de Contratos*

Como cuestión de umbral, al disertar sobre la teoría general de contratos, es menester hacer referencia a aquella norma que postula que las obligaciones nacen de la ley, los contratos, los cuasicontratos y los actos y omisiones en que intervengan la culpa o negligencia. Art. 1042 del Código Civil, 31 LPRA sec. 2992. En lo que respecta a los contratos en particular, éstos existen cuando una o varias partes prestan su consentimiento a obligarse a dar alguna cosa o prestar algún servicio. Art. 1206 del Código Civil, 31 LPRA sec. 3371. *Véanse,* además, *Rodríguez Ramos v. E.L.A.,* 190

DPR 448, 454 (2014); *Unisys Puerto Rico, Inc. v. Ramallo Brothers*, 182 DPR 842, 852 (1991).

Un contrato será validado si concurren tres elementos esenciales, a saber: consentimiento, objeto y causa. Art. 1213 del Código Civil, sec. 3391; *Negrón Vélez v. A.C.T.*, 196 DPR 489, 505(2016); *Burgos López v. Condado Plaza*, 193 DPR 1, 28-29(2015); *Oriental Bank v. Perapi*, 192 DPR 7, 15 (2014); *Rodríguez Ramos v. E.L.A.*, *supra*, en la pág. 455; *Bosques v. Echevarría*, 162 DPR 830 (2004); *S.L.G. Irizarry v. S.L.G. García*, 155 DPR 713(2001). Una vez concurren dichos elementos, las partes involucradas quedan obligadas al cumplimiento de sus términos y condiciones, pues las obligaciones que nacen de los contratos tienen fuerza de ley entre las partes. Art. 1044 del Código Civil, 31 LPRA sec. 2994. *Oriental Bank v. Perapi*, *supra*, pág. 15; Asoc. Res. *Los Versalles v. Los Versalles*, 194 DPR 258 (2015); *Oriental Finances Services v. Nieves*, 172 DPR 462, 472 (2007); *López v. González*, 163 DPR 275, 281 (2004); *Master Concrete Corp. v. Fraya*, S.E., 152 DPR 616, 625 (2000). Cónsono con lo anterior, desde el momento en que las partes consienten, se obligan no sólo al cumplimiento de lo expresamente pactado, sino también a todas aquellas circunstancias que surjan del mismo y que, a su vez, sean conformes a la buena fe, el uso y la ley. Art. 120 del Código Civil, 31 LPRA sec. 3375; *Burgos López v. Condado Plaza*, 193 DPR 1, 8 (2015); *Oriental*

*Bank v. Perapi*, *supra*; *López v. González*, *supra*, en las págs. 281-282; *Jarra v. Axxis Corporation*, 155 DPR 764, 772 (2001).

De otra parte, como se sabe, el ordenamiento contractual en nuestra jurisdicción está enmarcado dentro del principio de autonomía contractual, es decir, que las partes pueden establecer los pactos, cláusulas y condiciones que tengan por convenientes siempre que no sean contrarias a la ley, la moral y el **orden público**. Art. 1207 del Código Civil, 31 LPRA sec. 3372; *Oriental Bank v. Perapi*, *supra*; *Pfizer v. Mun. de Vega Baja*, 182 DPR 267, 283 (2011); *Oriental Finances Services v. Nieves*, *supra*; *López v. González*, *supra*; *De Jesús González v. A.C.*, 148 DPR 255, 263 (1999). Es por ello que, "***independientemente del tipo de contrato de que se trate y de la importancia que éste merezca para las partes contratantes, es nulo y, por lo tanto, inexistente[,] un contrato que resulte contrario a las leyes, a la moral o al orden público***". (Énfasis nuestro) *De Jesús González v. A.C.*, *supra,* en la pág. 264. *Véanse*, además, *Mun. de Ponce v. A.C., et al.*, 153 DPR 1 (2000); *Morales v. Municipio de Toa Baja*, 119 DPR 682 (1987); *Sánchez Rodríguez v. López Jiménez*, 116 DPR 172 (1985). "*En tales casos, cualquiera de las partes contratantes puede impugnar el contrato, aunque se haya beneficiado del mismo*". *Rodríguez Ramos v. E.L.A.*, *supra,* en la pág. 455; *De Jesús González v. A.C.*, *supra. Véase*, además, *Rasa Eng. Corp. v. Daubón*, 86 DPR 193 (1962).

No olvidemos que este Tribunal ha definido el concepto de "*orden público*" como un "*medio para lograr un balance entre la autonomía de la voluntad de las partes y la imprescindible protección del bienestar común*". *De Jesús González*, *supra*, en la pág. 266. Así, hemos sostenido que el Tribunal no puede auxiliar a litigantes que han incurrido en conducta contraria a la ley, la moral y el orden público para que perfeccionen su transgresión. En ese sentido, la doctrina de orden público se ha tomado como base para declarar nulas las cláusulas que atentan crasamente contra el buen orden del sistema jurídico, como en el caso de las "*cláusulas de los contratos de carácter leoninas*"; que son cláusulas que otorgan a una de las partes contratantes una ventaja injustificada que es contraria a la "*justicia conmutativa, a la reciprocidad de las prestaciones e interés que sirven de fundamento esencial de la legitimidad de un contrato*". *Íd.*, a la pág. 267. Este tipo de cláusula atenta contra el equilibrio en las prestaciones contractuales, que constituye una "*premisa intrínseca a los contratos válidos*". *Íd.*, en las págs. 266-267.

Por último, hemos sido enfáticos al expresar que la contratación gubernamental se encuentra revestida del más alto interés público, por involucrar el uso de bienes o fondos gubernamentales. Por lo tanto, es necesario que se apliquen rigurosamente las normas sobre contratos, a los fines de proteger los intereses y el dinero del Pueblo.

*C.F.S.E. v. Unión de Médicos*, 170 DPR 443, 452 (2007); *De Jesús González v. A.C.*, 148 DPR 255 (1999). "*Principalmente, no se puede ignorar que todo organismo gubernamental está obligado a observar cabalmente la esencia de las disposiciones constitucionales porque los fondos públicos sólo pueden gastarse para fines públicos legítimos*". *C.F.S.E. v. Unión de Médicos*, *supra*, en la pág. 452. Ello, pues el Gobierno "*no puede actuar de un modo que esté reñido con los principios que encarna el orden constitucional*". *De Jesús González v. A.C.*, *supra,* en la pág. 268.

Establecido lo anterior, por tratarse aquí de la interpretación de un contrato de transacción, conviene también repasar, a grandes rasgos, la normativa que regula los mismos. Veamos.

*B. El Contrato de Transacción*

Un contrato de transacción es aquel en el que las partes, mediante concesiones recíprocas, evitan la provocación de un pleito o ponen fin al que ya había comenzado. Art. 1709 del Código Civil, 31 LPRA sec. 4821; *Negrón Vélez v. A.C.T.*, 196 DPR 489, 504 (2016); *US Fire Insurance v. A.E.E.*, 174 DPR 846 (2008); *Lopez Tristani v. Maldonado Carrero*, 168 DPR 838 (2006); *Neca Mortg. Corp. v. A & W Dev. S.E.*, 137 DPR 860, 870 (1995).

Los elementos que constituyen este tipo de contrato lo son: (1) una relación jurídica incierta y litigiosa; (2) la

intención de los contratantes de componer el litigio y sustituir la relación dudosa por otra cierta e incontestable, y (3) las recíprocas concesiones de las partes. Art. 1709 del Código Civil, *supra*; *Fonseca v. Hosp. HIMA*, 184 DPR 281 (2012); *Mun. San Juan v. Prof. Research*, 171 DPR 219, 239 (2007); *López Tristani v. Maldonado Carrero*, *supra*; *Neca Mortg. Corp. v. A & W Dev. S.E.*, *supra*. *Véase*, además, S. Tamayo Haya, *El Contrato de Transacción*, Madrid, Ed. Thomson/Civitas, 2003, pág. 75. Siendo ello así, la "*reciprocidad en las prestaciones es la base indispensable de este contrato*". *Mun. San Juan v. Prof. Research*, *supra,* en la pág. 240, citando a J. Santos Briz y otros, *Tratado de Derecho Civil*, Barcelona, Ed. Bosch, 2003, T. IV, pág. 583.

Ahora bien, existen dos tipos de contratos transaccionales: los judiciales y los extrajudiciales. Cuando las partes alcanzan un acuerdo que elimina la controversia antes de comenzar un pleito, o luego de comenzado el litigio, pero sin intervención del tribunal -- y, por ende, se desiste de la causa de acción, -- estamos ante un acuerdo extrajudicial. Sin embargo, si luego de iniciado el pleito, las partes acuerdan eliminar la disputa y solicitan incorporar el acuerdo al proceso judicial, se trata de un contrato de transacción judicial que tiene el efecto de culminar el pleito. *Negrón Vélez v. A.C.T.*, *supra,* en la pág. 505; *Neca Mortg. Corp. v. A & W Dev. S.E.*, *supra,*

en las págs. 870-871. *Véase,* además, *Mun. San Juan v. Prof. Research*, *supra*.

**Por último, hemos señalado que, al interpretar un contrato de transacción, son de aplicación las normas generales sobre interpretación de contratos antes mencionados, siempre y cuando no sean incompatibles con el acuerdo entre las partes. Particularmente, aquellas que tratan sobre la necesidad de descubrir la verdadera intención de los contratantes cuando ésta no surge claramente de los términos del contrato.** *Sucn. Román Febres v. Shelga Corp.*, *supra,* en la pág. 790. Nos resulta importante mencionar aquí que, en cuanto a un contrato de transacción, las disposiciones contenidas en el Art. 1714 del Código Civil, 31 LPRA sec. 4826, son claras al disponer que se "*impide interpretar, en ausencia de clara expresión al efecto, que el contrato de transacción incluye materias totalmente distintas y ajenas a la controversia que motivó la transacción*". *Sucn. de Román Febres v. Shelga Corp.*, *supra,* en la pág. 790. *Véase,* además, *Blas v. Hospital Guadalupe*, 167 DPR 439 (2006).

En esa dirección, hemos sostenido que, de surgir alguna controversia respecto a este tipo de contrato, los mismos deben interpretarse de forma restrictiva. *Sucn. Román v. Shelga Corp.*, *supra,* en la pág. 789. Ello, pues, particularmente, las transacciones judiciales "*están matizadas por... mutuos sacrificios de régimen excepcional*

*en algunos aspectos [y, por lo] tanto, no deben interpretarse con extensión, sino restrictivamente"*. *López Tristani v. Maldonado Carrero, supra,* en la pág. 847; *Blas v. Hospital Guadalupe, supra,* en las págs. 449-450; *Rivera Rodríguez v. Rivera Reyes,* 168 DPR 193, 208 (2003).

Es, pues, a la luz de la normativa antes expuesta que procedemos a disponer de la controversia ante nuestra consideración.

IV.

Como ha quedado aquí esbozado, en el presente caso y en lo que aquí nos concierne, el Departamento de Hacienda le notificó ciertas deficiencias contributivas a Demeter sobre los años contributivos 1996 al 2003, aproximadamente. Inconforme, Demeter presentó una demanda en contra de la referida agencia gubernamental ante el Tribunal de Primera Instancia y, luego de varios trámites procesales, las partes suscribieron un acuerdo transaccional con el propósito de poner fin al pleito. Como ya vimos, el referido acuerdo disponía que por el pago de la suma de dinero de $32,020.00, se entenderían pagados, saldados y cerrados *todos* los años contributivos de Demeter, incluyendo los años del 1996 al 2003, incluso. Asimismo, se dispuso que, al momento de suscribir el referido acuerdo y según lo pactado, el efecto sería que se eliminarían las deudas a nombre de Demeter y se

dejarían sin efecto las imputaciones y tasaciones por concepto de contribución sobre ingresos.

Fundamentándose en lo anterior, Demeter argumenta que el pasado 15 de junio de 2012, fecha en que suscribió el referido documento, llegó a un acuerdo final con el Departamento de Hacienda mediante el cual quedaba liberado de cualquier deuda contributiva que tuviese la referida empresa desde el año 1996 hasta el año 2012; es decir, más allá de los años para los cuales se litigó el pleito (entiéndase, del año 1996 al 2003, incluso). Manifestó que, por virtud de dicho acuerdo, el Departamento de Hacienda estaba vedado de imputar deficiencia alguna hasta el año contributivo 2012. No le asiste la razón. Como hemos visto, y conforme a la normativa antes expuesta, el referido acuerdo no puede ser interpretado según la pretensión de Demeter. Nos explicamos.

Un análisis detenido y desapasionado del acuerdo bajo estudio revela que la única interpretación posible y correcta en derecho de lo que Demeter verdaderamente pactó, o pudo haber pactado, con el Departamento de Hacienda fue el pago de $32,020.00 para cubrir las deudas contributivas comprendidas en los años de 1996 a 2003. Esto se refiere a los años en los que Demeter, conforme a la normativa legal y reglamentaria aplicable, ya tenía deudas tasadas y anotadas en los sistemas del Departamento de Hacienda, tales como las deudas contributivas de los años 1998 y 1999, objeto del

presente litigio. De hecho, estos son los únicos dos períodos contributivos relacionados al pleito sobre los que, al final del día, se reflejaban deudas atribuibles a Demeter en los sistemas del Departamento de Hacienda.

Cónsono con dicha interpretación, el Departamento de Hacienda correctamente canceló las deficiencias correspondientes a los años contributivos de 1998 y 1999, expidió una *Certificación Negativa de Deuda* y expidió el *Memorando de Cancelación y Ajuste de Deuda (Formulario SC2625)*. Como cuestión de hecho, en la *Certificación de Deuda* expedida a favor de Demeter, claramente incluyó la advertencia a los efectos de que la certificación en cuestión **no incluía deudas pendientes por tasar o en proceso de investigación a la fecha de la certificación.**

Notemos que, en el referido acuerdo, se mencionan específicamente los años contributivos de 1996 al 2003. Es decir, los años que en todo momento se estuvieron litigando en el Tribunal de Primera Instancia. En ningún momento estuvieron, ante la consideración del foro primario, otros periodos contributivos ajenos a los que dieron pie al litigio. Siendo ello así, nos parece irrazonable concluir que con el pago de $32,020.00, Demeter quedó liberado de toda deuda que pueda surgir entre el periodo de 2004 al 2012. Menos aún, cualquier deuda contributiva futura, posterior al año 2012.

Aceptar la interpretación de Demeter respecto al segundo párrafo del acuerdo, presupone que el Departamento de Hacienda, además de dar por satisfechas las contribuciones por los periodos contributivos objeto del litigio, estaría renunciando a investigar y tasar deudas que puedan surgir sobre los años contributivos entre 2004 al 2012. Dicha apreciación, sin duda alguna, causaría un desbalance en las prestaciones ya que sería sumamente ventajoso para Demeter, pues por el pago de $32,020.00, el Departamento de Hacienda renunciaría a cumplir con su deber legal de imponer y cobrar deficiencias sobre periodos que ni siquiera han sido investigados y/o tasados. Ello resultaría contrario a los mejores intereses del erario y a los principios más elementales de orden público que enaltecen nuestra sociedad.

En conclusión, sostenemos que, en el presente caso, la interpretación razonable, correcta y válida en derecho, conforme a los términos contenidos en el acuerdo final pactado por las partes, es que el mismo se circunscribe exclusivamente a los periodos contributivos que originaron el litigio y que estaban debidamente tasados e investigados; es decir, el periodo que cubre los años de 1996 al 2003. Por lo tanto, el Departamento de Hacienda no puede notificar deficiencias contributivas **en cuanto a ese periodo de 1996 al 2003.**

De conformidad con lo anterior, preciso señalar que el acuerdo final objeto del presente pleito no es nulo, sino

que su eficacia -- y, por lo tanto, su efecto vinculante entre las partes suscribientes -- se limita, necesariamente, al periodo contributivo en controversia. Nótese que, contrario a lo prohibido por la Sección 6051.7 del *Código de Rentas Internas de 2011*, *supra*, la conclusión a la cual hoy llegamos **no tiene el efecto de anular, modificar, dejar sin efecto o ignorar el acuerdo final suscrito por Demeter y el Departamento de Hacienda.** Por el contrario, nuestra función se ha limitado a interpretar, en estricto derecho, el alcance correcto del mismo.

Cónsono con ello, finalizamos señalando que a través del referido acuerdo final, el Departamento de Hacienda no renunció a su facultad de investigar, tasar y/o cobrar contribuciones sobre los demás periodos, a saber, entre 2004 y 2012.

En vista de lo anterior, no se cometieron los errores señalados.

V.

Por los fundamentos antes expuestos, se confirma la sentencia del Tribunal de Apelaciones.

Se dictará sentencia de conformidad.

Ángel Colón Pérez
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Demeter International, Inc.

    Peticionario

        v.

Secretario de Hacienda

    Recurrido

CC-2013-1036

SENTENCIA

En San Juan, Puerto Rico, a 12 de febrero de 2018.

Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte de la presente Sentencia, se confirma la sentencia del Tribunal de Apelaciones.

Lo acordó el Tribunal y certifica el Secretario del Tribunal Supremo. La Juez Asociada señora Rodríguez Rodríguez no intervino.

Juan Ernesto Dávila Rivera
Secretario del Tribunal Supremo